JEFFREY, Appellant, v. TROUSE et al., Respondents.

(No. 7,408.)

(Submitted September 20, 1935.   Decided October 24, 1935.)

[50 Pac. (2d) 872.]

Cause submitted on briefs of Counsel.

*Mr. Thomas N. Marlow,* for Appellant.

*Mr. Walter H. Hanson,* of the Bar of Wallace, Idaho, and *Mr. W. L. Hyde,* for Respondents.

MR. JUSTICE MORRIS delivered the opinion of the court.

This action is founded in damages alleged to have been sustained by the plaintiff by reason of false and fraudulent representations of the defendants relative to the boundary lines of certain real estate, described in the complaint, sold by defendants to the plaintiff. The cause was tried by a jury, a verdict found in favor of the defendants, and judgment entered thereon. The action is here on appeal from the judgment, and is submitted on briefs without oral argument.

The defendants are husband and wife and, prior to May, 1929, conducted a tourist camp for profit at "Cabin City." In addition to operating the camp, defendants carried a small stock of merchandise in one of the cabins, catering to the tourist trade. In the latter part of April, 1929, the plaintiff in quest of a tourist camp site contacted H. S. Bates, of Missoula, a real estate agent. The plaintiff and Bates thereafter visited and looked over the site referred to as Blue Slide camp site, but made no deal for that property. Some time later the two started out to again visit the Blue Slide site, but on the way concluded it was not satisfactory, and, in passing Cabin City, Bates advised the plaintiff that that site was for sale. They stopped to look it over, made the acquaintance of the defendants, viewed the site with the defendant T. H. Trouse, and the negotiations that followed resulted in the plaintiff's entering into

the contract to purchase the site which later led to this controversy. Pursuant to the provisions of the contract, defendants executed a warranty deed in favor of the plaintiff, deposited the same in a Missoula bank, and plaintiff paid $4,000 of the purchase price of $9,000 and took possession of the premises. The contract further provided for the payment of the balance of $5,000 in annual installments of $500 each. In addition to the initial payment of $4,000, plaintiff, it appears, paid one annual installment. About sixteen months later, or, as it is alleged by plaintiff, in the fall of 1930, plaintiff discovered that the east boundary line was not where he had been led to believe it was; the line represented running over to the east far enough to take in Twelve Mile Creek and the more desirable portion of the camp site, while the correct line ran along the west bank of the creek leaving the creek, a particularly valuable feature of the camp site, along with the better part of the camp site, on land not included in the tract sold by the defendants to the plaintiff. The dividing line between the Trouse land and adjoining land was the section line between sections 34 and 35. Twelve Mile Creek and that part of the camp site to the east of that creek were on section 35. It appears from the record that some time subsequent to the fall of 1930, when plaintiff discovered where the true boundary line of the land was, the plaintiff and Trouse had some controversy about the matter, and plaintiff told Trouse he wanted the land he had bought in the camp site and charged Trouse with having deceived him about the eastern boundary line when the deal was pending. Trouse denied having practiced any deception on the plaintiff.

The amended complaint was filed in this action January 20, 1933. The defendants filed both a demurrer and an answer April 29, 1933. The record does not show that the demurrer was directly passed upon; it does show, however, that it was passed upon indirectly when, on the trial, plaintiff had put in his evidence and rested, the court denied defendants' motion of nonsuit, and again, when the evidence was all in, defendants again renewed their motion of nonsuit which was again denied.

The answer traverses all the material allegations of the complaint.

The complaint alleges, in substance, that the defendants falsely and fraudulently and with the intent to deceive the plaintiff and induce him to enter into the contract, represented the east boundary line to be 160 feet farther east than the correct boundary line was found later to be, and that plaintiff, trusting in the representations made to him by the defendants, did not survey the land or further investigate the matter, but depended upon defendants' representations as to the eastern boundary line, and entered into the contract to his injury and damage in the sum of $3,000, for which amount he prays judgment against the defendants. Plaintiff further alleges that defendants knew he was in quest of and desired to buy a tourist camp site, and that Bates, the real estate agent, knew plaintiff was looking for a tourist camp site and that plaintiff and Bates were on their way to look at another site when, at Bates' suggestion, they stopped to see the site of the defendants. Bates was the agent of the defendants. Plaintiff further alleges that the 160 acres of land involved in the controversy had but little value except for the camp site which he assumed was located thereon; that the land was mountainous and rocky, with slight value for agricultural or grazing purposes; it carried some timber, but had been "logged off." Included in the sale were two cows, fifty chickens, a small stock of merchandise and other personal property. The record does not supply very definite information as to the value of the personal property, but plaintiff gave an estimate on various items which would reach a total of approximately $800.

Specifications of error are alleged as follows: (1) The evidence in the case is insufficient to justify the verdict of the jury. (2) The verdict of the jury is against law. (3) The judgment entered on the verdict is against law. (4) The verdict is contrary to the evidence. (5) The evidence is insufficient to support the judgment. Appellant deals with these specifications together.

The crux of the controversy is as to whether or not the plaintiff was misled as to the east boundary line of the land to the extent that he believed the line far enough to the east to include in the tract he bought that portion of the Twelve Mile Creek that traverses the camp site at that point for, as it appears from the map in evidence, about 1,000 feet, and also to include that portion of the camp site east of the creek which it appears was the most desirable, commodious and attractive part of the site. The contentions of counsel and the testimony logically classify the assignments of error into (a) that the verdict is contrary to the evidence, and (b) that the verdict and judgment thereon are contrary to law. From the record, it appears to us that the verdict is contrary to the evidence.

The powers of this court to review the verdict of a jury are circumscribed by statutes and rules based thereon which permit of little discretion here. It is the rule that when the record presents a conflict in the evidence resolved by the jury in favor of a party, this court is precluded from disturbing the verdict. (*Morton* v. *Mooney,* 97 Mont. 1, 33 Pac. (2d) 262, 265, and cases cited.) The rule is fairly well established in this jurisdiction, however, that neither the trial court nor the jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to law if such testimony does not exceed probability. (*Morton* v. *Mooney,* supra; *West* v. *Wilson,* 90 Mont. 522, 4 Pac. (2d) 469; *Giebler* v. *Giebler,* 69 Mont. 347, 222 Pac. 436, 438; *Haddox* v. *Northern Pacific Ry. Co.,* 43 Mont. 8, 113 Pac. 1119; *First State Bank* v. *Larsen,* 65 Mont. 404, 211 Pac. 214; *Harwood* v. *Scott,* 65 Mont. 521, 211 Pac. 316; *Boe* v. *Lynch,* 20 Mont. 80, 49 Pac. 381.)

Neither is the jury, the trial court nor this court, on review of the proceedings had in the lower court, bound to accept the unimpeached testimony of a witness that is so incredible and improbable as to repel common sense and reasonable belief. In *Morton* v. *Mooney,* supra, it was said: "It is true that, where the record presents a conflict in the evidence, resolved by the jury in favor of the plaintiff, the action of the jury precludes

this court from disturbing the verdict [citing cases], but this is true only when there is substantial evidence in the record to support the verdict and judgment''—citing cases.

In reversing a verdict in the case of *Casey* v. *Northern Pacific Ry. Co.*, 60 Mont. 56, 198 Pac. 141, 144, this court said: ''Counsel for plaintiff insist that the evidence is conflicting, and, since the jury found upon the issues and the lower court denied a new trial, this court is without authority to interfere, but the principal conflicts arise upon the plaintiff's own testimony, rather than in the testimony of opposing witnesses. Of the testimony of the witnesses for defendant it is sufficient to say that it is harmonious, and reasonable and consistent with physical facts, but the jury disregarded it altogether and must have based the verdict solely upon the surmises, the guesses, and estimates of the plaintiff.'' In the case of *Giebler* v. *Giebler*, supra, it is said: ''The rule that the trial court may not disregard uncontroverted credible evidence is fundamental; * * * this court has not hesitated to set aside findings contrary to the preponderance of the evidence, and this we deem to be the duty imposed by our Bill of Rights.''

It was said in *Sylvain* v. *Page*, 84 Mont. 424, 276 Pac. 16, 20, 63 A. L. R. 528: ''The rule that the trial court may not disregard uncontroverted credible evidence is fundamental.'' We think this rule applies to the verdict of a jury under the cases heretofore cited on that point.

Taking up the testimony of the witnesses, we think that, standing alone, the testimony of the plaintiff clearly established his right to recover under his allegations. It is obvious that the trial judge entertained the same view when he denied defendants' motion for nonsuit. While the witnesses of the parties, in some slight degree, corroborated the party for whom they were called to testify, the decision in the case must turn on the testimony of the plaintiff himself, aided materially by circumstances surrounding the transactions related, on the one side, and the testimony of Thomas H. Trouse on the side of the defendants. It then becomes important to analyze the testi-

mony of these two, and determine to what extent the testimony of Trouse impeached and destroyed the testimony of the plaintiff.

Plaintiff's contentions are either admitted or established by unimpeached evidence in the following particulars: (1) Plaintiff, in quest of and desiring to buy a tourists' camp site, in company with defendants' agent called upon the defendants, and negotiations were begun for the purchase of defendants' site. (2) Defendants knew plaintiff was there for the purpose of buying a tourist camp site to be carried on as a business proposition. (3) Defendants had lived on the Cabin City site where they were then located, and had operated it for profit, first as a hunting lodge, and then as a camp site, since 1912. (4) There was but one camp site at Cabin City, and that was in possession of, and had been improved by, the defendants. (5) The camp site shown to plaintiff by the defendants was in one body traversed by Twelve Mile Creek. (6) The 160-acre tract of land sold by defendants to plaintiff was mountainous, rocky, carried some timber that had been "logged off," and had little value except for the value in the camp site. (7) A good portion of the improvements on the camp site exhibited by defendants to plaintiff was on land not owned by defendants. (8) The part of the camp site not owned by defendants was and is more desirable as a camp site than that part owned by them. The evidence tends to establish the fact that defendants did not use any land on the west side of the creek for tourist camp purposes; but this is left in doubt. (9) While the negotiations were pending, defendants exhibited to plaintiff an abstract of title to the land involved in the deal and a map showing the camp site and Twelve Mile Creek to be on the Trouse land. (10) The correct line later discovered runs along the west bank of Twelve Mile Creek and shows the creek and the camp site east of the creek to be off the Trouse land.

None of these facts are controverted by the record, except that an objection was made by counsel for defendants at the trial to plaintiff's testifying to what the map accompanying

the abstract showed. Testimony by the plaintiff Jeffrey on this point was in part as follows:

"Asked if there was a map or anything shown to me at that time as to where the boundaries were, well there was a map that was in with the abstract but I can't recall just when that was but it was sometime during the negotiations that it was shown to me. The Plaintiff's Exhibit 2, so marked for identification, is the abstract of which I speak and which shows the map I referred to." (The exhibit referred to here as Plaintiff's Exhibit 2 is mentioned in appellant's brief as Defendants' Exhibit 2. Whether it was plaintiff's or defendants' exhibit the record furnishes no means of determining, as it was never offered or received in evidence, but it is obvious that it was in the hands of the plaintiff when he testified as to its contents.)

"Q. And this map shows the property to be on defendants' land?

"Mr. Hanson: Objected to. The exhibit speaks for itself.

"The Court: Yes; sustained. Exception.

"The Witness: This is the map. This line here on the map represents Twelve Mile Creek. That map shows that property as being here. The fact that the map and the abstract shown to me by the defendants at that time showed this creek and this land to be within the boundaries of their land, influenced me in making up my mind to buy the property; in fact it rather clinched my idea of taking this land as it was represented. When I was in the house there and about the buildings, Mrs. Trouse was there and she heard our discussion and knew what we were talking about."

The objection to the plaintiff's testifying as to what the map showed was sustained, but plaintiff was allowed to proceed. The objection, as above stated, was that the exhibit spoke for itself; not to what it revealed. When the plaintiff subsequent to the objection was allowed to proceed without objection and state what the map showed, we think that left the testimony in the record free of objection, and it was not otherwise impeached.

Furthermore, Plaintiff's Exhibit No. 1 is a map or sketch drawn by plaintiff of the Cabin City camp site and was admitted in evidence over defendants' objection. After the admission of this exhibit, plaintiff, while on the witness-stand, pointed out and explained in detail the numerous lines and markings drawn thereon, without objection. This exhibit shows the line between sections 34 and 35 to be the dividing line between the Trouse land and the adjoining land. The Trouses own no land in section 35. The map shows Twelve Mile Creek and that part of the camp site admitted to be the real tourist camp site to be located off the Trouse land and on section 35. The creek runs through the camp site at that point for about 1,000 feet as it appears on plaintiff's map, and cuts back onto the Trouse land at either end of the 40-acre line. From this map the creek touches and runs into the Trouse land some distance away from the camp site. The testimony of the plaintiff as to what the two maps show is unimpeached evidence in the case. The jury had no right to disregard plaintiff's testimony where he stated the map shown him by defendants, while sale was pending, showed the creek and the camp site east of the creek to be on the Trouse land.

The testimony of the plaintiff for himself and the testimony of Trouse for the defendants is in sharp conflict on the question as to what representations were made to the plaintiff, while negotiations were in progress, about the east boundary line. Plaintiff contends he was led to believe the line took in the creek, and Trouse is just as emphatic that no such representations were made. Pertinent parts of Trouse's testimony are as follows: ''Never at any time either before or after this transaction was made with Mr. Jeffrey did I ever fix that east boundary line or pretend to him that I knew where it was. I have never done that. * * * I did not represent to him that any part of the original camp ground now belongs to or had belonged to me. As a matter of fact, I did not know nor do I know now exactly where that line runs.''

The testimony of H. S. Bates, called as a witness for the defendants, is not very definite on the vital questions in issue. He testified that he thought something was said about the boundary line of the Trouse property, and that Mr. Trouse had expressed some doubt about the east boundary line. On cross-examination he testified: ''I did not say that Mr. Trouse did not seem to realize at that time that he did not own that camp site. He represented to Mr. Jeffrey and to me that he owned what was west of the east section line and he owned it in a westerly direction, and I would say that it had some value. I could not say definitely where that line would have been with reference to this camp site, nor could I locate it definitely. Asked if the fixtures on the camp site were on the ground Mr. Trouse represented them to be on, well if we were directly north of that corner and on the portion of the ground in question, then they would have been on his property, yes. * * * I was there on this particular camp site at that time when he was making these statements about the boundary lines. My answer will have to be somewhat indefinite as to what was on the camp site at that time in the way of camp equipment, and if you will let me explain that—from the place where we were standing I noticed two camp kitchens, and I know where the camp was, and I got the idea from what Mr. Trouse said there that the camp kitchens were on his property. * * * Asked if I got the idea that Twelve Mile Creek was on his property, well, we had been standing directly north of that part of Twelve Mile Creek there and I may have. I presume that I represented Mr. Trouse on that deal with the idea of seeing it through. As to his camp site being on the Trouse property that they were selling to Jeffrey or on a portion of these premises, well, I wasn't interested in that.'' Bates' previous testimony shows that he went with Jeffrey to look at the Trouse camp site, and that Jeffrey was looking for a camp site with the intention of buying if a suitable site was found.

The Bates testimony, while not definite on vital questions, tends to support the plaintiff's case more than that of the de-

fendants. He got the impression "from what Mr. Trouse said" that the two camp kitchens and Twelve Mile Creek "along there" were on the Trouse property. The correct line shows the two camp kitchens to which Bates obviously referred and the creek "along there" to be outside the bounds of the Trouse land. Bates corroborates the plaintiff on the point that Trouse represented to the plaintiff that they had made money out of the camp site on the east side of the creek.

Mrs. Trouse on direct examination corroborates her husband as to what the latter told the plaintiff about not owning the camp site east of the creek, but stated that the plaintiff said that was what he wanted. On cross-examination the witness said her husband told the plaintiff that part of the camp site did not belong to them, and she knew of no other camp site there at that time except the one used by them; and further testified as follows: "Asked if I know what they went over there for where this camp site is located and why it was they went there, well, they wanted to see the place. As to my knowing it to be a fact that Mr. Trouse took Mr. Jeffrey over there for the purpose of showing him the location and the value of this particular camp site, well he told him how he used it and how we owned it. As to our charging the tourists twenty-five cents for each car that stayed there, well you know the season is short there to make any money. It didn't pay us to go over there and did not pay us enough to take care of it. It isn't more than two hundred yards from the house we were living in, or the place where we were living, but it was across the old right of way and you couldn't always go there for twenty-five cents. We had camp tables put up there and camp kitchens put up there and we had these beds put up there, and we had the grounds fixed up with electric lights, for the accommodation of the tourists. We called this place Cabin City Camp ground. My husband and I were the owners of it."

On redirect examination by Mr. Hyde the witness said: "We had lights on the place and we had some arrangements with the

Mann Lumber Company, pole arrangements, and Mr. Hills, our predecessor, used it before we did.

"Q. Did you ever at any time prior to the consummation of this sale indicate to Mr. Jeffrey directly or indirectly that you or your husband had any interest in this place or the camp ground over to the east end of the creek? (Objection interposed but overruled.) A. Not only what we stated there to him."

That the camp site east of the creek, which it would appear from the testimony of Mrs. Trouse was the only tourist camp site there was at Cabin City camp site, was shown to the plaintiff while the sale was pending, there is no doubt. What was represented to the plaintiff about its ownership and where the boundary line was, there is sharp conflict. From the record it is quite clear that Trouse attempted in some way and to some extent to indicate to the plaintiff where the east boundary line of the Trouse land was, and that the plaintiff believed from the representations of defendants that the line was somewhere to the east of Twelve Mile Creek is also obvious. Trouse testified, as heretofore mentioned, that he did not know then nor at the time of the trial where the line was. Bates, a witness for the defendants, testified he did not know where the line was, but got the impression from what Trouse said that the line took in the creek "along there." Mrs. Trouse testified, as above, that she heard her husband tell the plaintiff they did not own the camp site east of the creek. It is clear that Trouse undertook to point out to some extent, at least, where the line was, and that his representations to the plaintiff led the latter to believe the line was east of the creek. The map shown plaintiff along with the abstract showed the Trouse boundary line east of the creek approximately 120 to 140 feet. The only positive testimony of any witness as to where the line was, as pointed out by Trouse, is that of plaintiff who places the line near two trees about 150 feet east of the creek according to Plaintiff's Exhibit No. 1.

In *Post* v. *Liberty*, 45 Mont. 1, 121 Pac. 475, 478, where the facts under consideration were much like those here, the

court said: "What effect do such representations have upon the sale, when it appears that they were erroneous? The question is not a new one. It has been considered by the courts in many cases, and the decisions are quite harmonious and founded in sound reason. The theory upon which they proceed is that the owner of real estate is presumed to know the location of his land; and if, in attempting to sell it, he undertakes to point out its location or its boundaries he is bound to do so correctly. In other words, his representations amount, in effect, to warranties; and if the land he points out is of greater value than the land he actually sells, the purchaser may rescind the contract, or sue for damages"—citing cases.

The testimony of the plaintiff is harmonious, reasonable and consistent with the physical facts; the testimony of T. H. Trouse is not. The testimony of plaintiff is corroborated by the maps introduced in evidence and, in a measure, by defendants' own witnesses. The testimony of the defendants stands alone, as the testimony of the witness Bates is more favorable to the plaintiff than to the defendants. We think the verdict is contrary to the evidence.

In view of our conclusions as to the merits of the action on the evidence, the contentions of counsel on other phases of the case become unimportant here.

The verdict is set aside and the judgment is reversed and the cause remanded to the district court of Mineral county, with direction to grant the plaintiff a new trial.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. CHIEF JUSTICE SANDS, absent on account of illness, takes no part in the foregoing decision.