# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39556-2012

WILLIAM J. WATERS, )
)  Pocatello, May 2013 Term
Claimant-Appellant, )
)  2014 Opinion No. 27
v. )
)  Filed: March 18, 2014
ALL PHASE CONSTRUCTION, Employer, )
and  STATE INSURANCE FUND, Surety, )  Stephen W. Kenyon, Clerk
)
Defendants-Respondents. )
)

Appeal from the Industrial Commission of the State of Idaho.

The order of the Industrial Commission is affirmed.

James C. Arnold, Petersen Parkinson & Arnold PLLC, Idaho Falls, argued for appellant.

Steven R. Fuller, Fuller & Fuller PLLC, Preston, argued for respondents.

_____

EISMANN, Justice.

This is an appeal from the Industrial Commission in a worker's compensation proceeding in which the Commission held that the claimant had failed to prove that symptoms occurring after his industrial accident were caused by the accident, where following his industrial accident he had been twice injured in non-industrial accidents and refused to provide the medical records regarding those injuries.  We affirm the order of the Commission.

## I.
## Factual Background.

On June 15, 2006, William Waters (Claimant) was working as a drywall hanger and taper. While assisting his supervisor to hang drywall overhead, the supervisor instructed Claimant to push the drywall up with his head.  When Claimant did so, he felt pain in his neck and right shoulder.  On July 29, 2006, claimant sought medical care from a chiropractor.  When

his shoulder pain and weakness did not resolve, Claimant went to Gregory West, M.D., an orthopedic traumatologist, on September 26, 2006. After further testing and the failure of conservative therapies to relieve the symptoms, Claimant underwent an anterior cervical discectomy and fusion surgery at C5-6 on January 31, 2007. It is undisputed that the surgery was necessitated because of the injury Claimant received in the industrial accident.

On April 11, 2007, the orthopedic surgeon who performed the surgery examined Claimant. He noted that Claimant had minimal pain, no numbness or tingling, and no problems except some difficulty swallowing when he hyper-extended his neck in the shower and some discomfort when swallowing. The surgeon's notes recorded:

> The patient really has minimal pain. Normal neurologic function in the upper extremities. He has no numbness or tingling. The only dysphagia is when he is in the shower, when he stretches his neck and hyper-extends and notes when he swallows he has a little discomfort. Apart from that, the patient has no problems. The patient has no dysphonia.

The surgeon released Claimant to return to light work with a 45-pound lifting restriction. On May 23, 2007, the surgeon again saw Claimant. The surgeon concluded that Claimant had reached medical stability, and he released Claimant to full activities, restricting him only from impact loading with axial activities, such as diving and gymnastics.

Claimant returned to drywall work, but was laid off due to his difficulty keeping up. He applied for jobs at a convenience store and at rental car agencies, but was not hired.

In July 2007, Claimant sustained a whiplash injury to his neck in a rear-end motor vehicle accident, for which he sought and received emergency medical care. During the first part of 2008, he tripped and fell while running, sustaining an injury to his right shoulder for which he also sought and received emergency medical care.

On August 28, 2008, Claimant returned to Dr. West for treatment of right shoulder pain. After examining Claimant and conducting further testing, Dr. West determined that he had shoulder weakness from a nerve injury likely due to Claimant's industrial accident.

Whether and to what extent Claimant was entitled to permanent partial disability benefits was tried to a referee. Claimant relied upon the testimony of two experts: Dr. West and a vocational rehabilitation consultant. Neither of them was provided with the medical records regarding the injuries Claimant sustained after his industrial accident, although Dr. West opined that a whiplash injury would affect Claimant's musculature, not his nerves. The central issue

was whether the medical conditions identified by Dr. West after August 28, 2008, were caused by the industrial accident. The referee concluded that Claimant had failed to prove that they were. The referee recommended that Claimant had failed to prove any permanent partial disability in excess of a 12% permanent partial impairment, which the State Insurance Fund (Surety) had already paid.

The Commission reviewed the record and the referee's recommendation and adopted the referee's proposed findings of fact and conclusions of law as its own. The only causation testimony from a medical expert came from Dr. West. The Commission found that Dr. West's opinion testimony was not entitled to any weight because it was based upon Claimant's version of his symptoms and their onset and Claimant's account was not credible. The Commission reasoned as follows:

> 42. The only evidence of deterioration in Claimant's condition, different from that observed by [the orthopedic surgeon], for fifteen months following May 2008, consists of Claimant's testimony. As determined, above, Claimant's testimony is not credible with respect to the time of onset of his symptoms. Furthermore, there is inadequate evidence to corroborate Claimant's testimony that he experienced significant pain with drywall work before July 2007 which, if proven, may have constituted grounds for finding [the orthopedic surgeon's] MMI [maximum medical improvement] finding premature.
>
> 43. Similarly, after May 2007 but before he consulted Dr. West in August 2008, Claimant sustained a whiplash-type injury to his neck, and, possibly, a trip and fall injury to his right shoulder. It is undisputed that Claimant sustained these injuries to the very locations he claims were only permanently injured as a result of his industrial accident. Claimant has failed to prove that the complaints with which he presented after August 28, 2008 are referable to the subject accident as opposed to one or more of the intervening events. Therefore, the symptoms reported to Dr. West cannot be assumed to have existed, either as of the date [the orthopedic surgeon] found Claimant reached MMI, or because of the industrial injury. As a result, Dr. West's opinions with respect to Claimant's industrially-related limitations and restrictions lack foundation, are given no weight, and are unpersuasive for the purpose of challenging [the orthopedic surgeon's] MMI assessment.

The Commission issued its order that "Claimant has failed to prove that he has sustained any permanent partial disability in excess of his 12% whole person permanent partial impairment, which Surety has paid." Claimant then timely appealed.

## II.
### Did the Commission Err in Failing to Find Credible the Testimony of Dr. West?

On an appeal from the Commission, the Constitution of the State of Idaho limits this Court "to a review of questions of law." Idaho Const. Art. V, § 9. "That provision is a limitation on our jurisdiction." *Fife v. The Home Depot, Inc.*, 151 Idaho 509, 513, 260 P.3d 1180, 1184 (2011).

"A worker's compensation claimant has the burden of proving, by a preponderance of the evidence, all the facts essential to recovery." *Evans v. Hara's, Inc.*, 123 Idaho 473, 479, 849 P.2d 934, 940 (1993). "One of the facts essential to the recovery of medical expenses is that the expenses were incurred as a result of an industrial accident." *Henderson v. McCain Foods, Inc.*, 142 Idaho 559, 563, 130 P.3d 1097, 1101 (2006). An employee's "employer and surety are only liable for medical expenses incurred as a result of 'an injury' (i.e., an employment related accident), or 'disability from an occupational disease.' I.C. § 72–432(1)." *Sweeney v. Great West Transp.*, 110 Idaho 67, 71, 714 P.2d 36, 40 (1986). "The fact that an employee suffered a covered injury to a particular part of his or her body does not make the employer liable for all future medical care to that part of the employee's body, even if the medical care is reasonable." *Henderson*, 142 Idaho at 563, 130 P.3d at 1101. A claimant, who has previously received benefits and is seeking benefits for additional medical care allegedly caused by the industrial accident, still has the burden of proving that the need for the additional medical care was caused by the accident. *Gomez v. Dura Mark, Inc.*, 152 Idaho 597, 601, 272 P.3d 569, 573 (2012).

"The Industrial Commission, as the factfinder, is free to determine the weight to be given to the testimony of a medical expert." *Eacret v. Clearwater Forest Indus.*, 136 Idaho 733, 737, 40 P.3d 91, 95 (2002). "The opinions of an expert are not binding upon the trier of fact, but are advisory only." *Clark v. Truss*, 142 Idaho 404, 408, 128 P.3d 941, 945 (2006). "It is the role of the Industrial Commission, not this Court, to determine the weight and credibility of testimony and to resolve conflicting interpretations of testimony." *Henderson*, 142 Idaho at 565, 130 P.3d at 1103. "On appeal, this Court will not conduct a de novo review of the evidence or consider whether it would have reached a different conclusion from the evidence presented." *Lopez v. State*, 136 Idaho 174, 178, 30 P.3d 952, 956 (2001).

In this case, Claimant promised to provide Surety with the medical records regarding his two accidents that occurred after the industrial accident, but then refused to do so. The

4

Commission failed to give any weight to Dr. West's opinion as to causation because Claimant had also failed to provide Dr. West with those records. The Commission found that Claimant was not credible as to when the second accident occurred. Claimant contends that the Commission erred in rejecting the unrebutted testimony of Dr. West as to causation.

A party presenting expert testimony has the burden of establishing the credibility of the expert. The credibility of an expert is not simply whether the expert is expressing an honest opinion. The Commission can take into consideration "whether or not the opinion takes into consideration all relevant facts." *Eacret*, 136 Idaho at 737, 40 P.3d at 95. In this case, Claimant chose not to provide his expert with medical records of his two accidents that occurred after his industrial accident and that injured the same parts of his body injured by his industrial accident. The Commission could certainly take the refusal to provide such records into consideration when determining the weight to be accorded the opinion testimony of Claimant's expert.

The Commission's holding is consistent with our recent opinion in *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 302 P.3d 718 (2013). In *Mazzone*, the claimant suffered a severe burn when he tripped at work, plunging his right forearm into a deep fat fryer. *Id*. at 753, 302 P.3d at 721. He sought benefits under the worker's compensation law for post traumatic stress disorder (PTSD) on the ground that his industrial accident was the predominant cause of the PTSD. The claimant "had a long history of psychiatric disorders prior to the industrial accident," which included severe psychological symptoms after a breakup with his girlfriend, reported symptoms of bipolar disorder and PTSD, insomnia, and stress regarding his son's medical problems. *Id.* at 757, 302 P.3d at 725.

Two psychiatrists testified that the claimant's industrial accident was the predominant cause of his PTSD, and the surety presented the testimony of a psychologist to the contrary. The Commission found the surety's expert more credible than the claimant's two experts because those experts "did not review his earlier medical history." *Id.* at 755, 302 P.3d at 723.

With respect to one of the claimant's experts, the Commission found the expert's opinion that the burn injury was more significant than any other factor in the development of PTSD lacked credibility, "because it does not accurately account for Claimant's prior psychological history." The Commission excluded the other expert's opinion from evidence as lacking in foundation because the expert admitted that "she would need to see Claimant's prior mental health care records to determine the effect his preexisting mental health condition has on his

5

post-burn injury mental condition," but she did not review them. In upholding the Commission, we stated, "The referee was entitled to consider the methodologies of all the experts, their examination of [claimant], their concerns with [claimant], and their consideration of his prior psychiatric history in determining which medical opinion was most credible." *Id*. at 756-57, 302 P.3d at 724-25.

Thus, in *Mazzone* we held that the Commission could decide not to give credibility to an expert medical opinion where the expert had failed to review all of the relevant medical records. Claimant argues that Surety had the burden of providing that there was a causal relationship between either of the two subsequent accidents and his current impairment and resulting restrictions. That argument is incorrect. Claimant had the burden of proving, by a preponderance of the evidence, all the facts essential to recovery. *Evans*, 123 Idaho at 479, 849 P.2d at 940. He chose not to provide his expert with the medical records regarding his injuries resulting from the two accidents that occurred after the industrial accident. The records would certainly appear relevant because those injuries were to the same parts of Claimant's body that were injured in the industrial accident. By doing so, he ran the risk that the Commission would not give any weight to the causation testimony of his expert.

"The spoliation doctrine is a general principle of civil litigation which provides that upon a showing of intentional destruction of evidence by an opposing party, an inference arises that the missing evidence was adverse to the party's position." *Stuart v. State*, 127 Idaho 806, 816, 907 P.2d 783, 793 (1995). "[W]e recognized the spoliation doctrine as a form of admission by conduct [in that] . . . the party is said to provide a basis for believing that he or she thinks the case is weak and not to be won by fair means." *Courtney v. Big O Tires, Inc.*, 139 Idaho 821, 824, 87 P.3d 930, 933 (2003). If a jury can reasonably infer that evidence deliberately or negligently destroyed by a party was unfavorable to the party's position, the Commission could reasonably infer that medical records intentionally withheld by Claimant in this case were unfavorable to his position.

### III.
### Conclusion.

We affirm the order of the Industrial Commission, and we award respondent costs on appeal.

6

Chief Justice BURDICK, Justices W. JONES, and HORTON **CONCUR.**

J. JONES, Justice, dissenting.

I dissent from the Court's opinion because the Commission's order is not supported by substantial evidence. "[I]f the findings of the Commission are not supported by substantial, competent evidence, they are not binding or conclusive. . . . In such instances, the findings of fact will set aside on appeal." *Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 758, 302 P.3d 718, 726 (2013).

This case does not present the same situation that was before the Court in *Mazzone*. In that case, there was conflicting expert testimony as to whether the workers' compensation claimant's industrial accident included a compensable psychological condition. *Id.* at 755, 302 P.3d at 723. The referee in *Mazzone* found that the expert testifying on behalf of the employer and surety "was more credible than Mazzone's experts because Mazzone's experts did not review his earlier medical history." *Id.* The Court concluded that the Commission's determination was supported by the record, despite a number of errors by the referee in that case (*Id.* at 758−61, 302 P.3d at 726−29), the same referee who presided in this case.

This case did not involve a battle of the experts. The Respondents in this case relied solely upon the notes of Dr. McCowin, who performed the surgery on Waters' back on February 26, 2007. The record contains no testimony from Dr. McCowin. Apparently, neither party felt it necessary to depose him or call him as a witness at the hearing to explain his notes. On the other hand, Dr. West—the physician who first treated Waters after his injury, beginning on September 26, 2006; who referred Waters to Dr. McCowin for surgery on January 31, 2007, after conservative treatment had failed; and who treated Waters after his surgery—testified by deposition, opining that Waters' post-surgery pain was due to the industrial injury. Dr. West's testimony was unrebutted but, nevertheless, rejected by the referee. Contrary to the situation in Mazzone, the record here discloses that any medical history unavailable to Dr. West was immaterial to the expert testimony he presented. Some additional factual history will be helpful in this regard.

When Waters initially sought treatment for his injury from Dr. West, the doctor performed an EMG test of Waters' upper extremity that revealed "a significant radiculopathy pattern at C6." A subsequent MRI established that Waters suffered from degenerative disc disease

7

at C5-6, as well as an annular tear, which Dr. West believed was related to Waters' industrial injury. Dr. West referred Waters to Dr. McCowin for the February 2007 surgery.

After his surgery, Waters was involved in a rear-end motor vehicle accident and sustained what he described as a "whiplash" type injury to his neck.[1] Also, Waters testified that in "Octoberish of 2008" he was running home from the Golden Crown Lounge late at night when he tripped and fell, hurting his right shoulder. Waters visited an emergency care facility on both occasions, but was unable to recall the dates of those visits. The record does not contain any medical records relating to these incidents.

On August 28, 2008, more than two years after Waters' industrial accident, he saw Dr. West, complaining of right shoulder pain. At that time, Dr. West was not aware of Waters' rear-end motor vehicle accident or his trip and fall, if the latter had occurred by that time. Dr. West believed that the pain Waters was experiencing was due to his industrial injury and surgery because Waters' C6 enervated nerves were still weak, which was affecting his shoulder. At this time, Dr. West ordered a Cybex test in order to better understand what was causing Waters' pain. The Cybex test was apparently performed on September 23, 2008. On November 11, 2008, based on the results from the Cybex test, Dr. West stated, "I think it is on a more probable than not basis [that Waters'] shoulder weakness [is] related to his radiculopathy and subsequent discectomy surgery." Further, Dr. West stated that Waters "may have an increased impairment rating. However, I have not seen his actual rating, so I cannot comment on whether or not this process was related."

On March 31, 2009, Dr. West reevaluated Waters' permanent partial impairment (PPI) rating, and found that instead of the 9% rating assigned by Dr. McCowin, Waters had a 12% PPI. The three percentage point difference was due to the fact that Waters was reevaluated with a new edition of the AMA Guide to Impairment, which employed different markers for rating nerve injuries.

On April 20, 2009, Waters filed his workers' compensation complaint. A hearing was held before Commission Referee LaDawn Marsters, on May 4, 2010, to address whether, and to what extent, Waters was entitled to permanent partial disability (PPD) benefits. Waters was the only

---

[1] No testimony from a medical professional or medical record confirms that Waters' injury from the July 2007 motor vehicle accident was consistent with a whiplash type injury. The only evidence about the accident comes from Waters' own testimony.

witness who testified at the hearing. Included in the record were the deposition of Dr. West and the depositions and reports of two vocational rehabilitation specialists, Kent Granat and William Jordan. Granat, who was retained by Waters, concluded that as of December of 2009 Waters' PPD was 58.4%, inclusive of impairment. In forming his opinion, Granat relied on medical reports from chiropractor Terry Burke, Dr. West, and Dr. McCowin. Jordan, hired by the Respondents, concluded that as of April of 2010 Waters' PPD was 25-27%, inclusive of impairment. In forming his opinion, Jordan relied on medical records from Dr. West and Dr. McCowin. In addition to the vocational rehabilitation experts, Dan Wolford, Industrial Commission Rehabilitation Division Consultant, found that as of July 16, 2007, "based on the restrictions/limitations from this industrial injury, [Waters] is able to return to his customary occupation."

The referee and Commission opined that Dr. West's testimony as to any disability in excess of 12% PPI was entitled to no weight because he was unaware of the rear-end motor vehicle accident and trip-and-fall incident. Since the vocational experts based their opinions partly upon Dr. West's testimony, their opinions were also disregarded. In my opinion, the Commission erred in disregarding all of the expert testimony based on supposed infirmities in Dr. West's uncontradicted medical opinions.

Based on Dr. McCowin's post-operative notes, the Commission found that Waters reached maximum medical improvement (MMI) on May 23, 2007.[2] The next medical record in evidence is dated August 28, 2008, when Waters returned to Dr. West complaining of shoulder pain. Between the time Dr. McCowin opined that Waters had reached MMI and when Waters again saw Dr. West, the Commission found that Waters "sustained a whiplash-type injury to his neck, and, possibly, a trip and fall injury to his right shoulder." Due to these intervening incidents the Commission stated:

---

[2] This finding was based on an office visit that occurred on May 23, 2007. The note Dr. McCowin made with regard to that visit reads:

07/12/07      **MEDICAL REPORTS REVIEWED**
          **Dr. McCowin** – (*Office Visit, 5/23/07*): I think the patient has reached stability. I am going to release the patient to full activities without restrictions at this time. The only restriction, however, I would place is to avoid impact loading with axial activities, such as diving and gymnastics, etc. His permanent impairment rating will be a 9% whole person impairment.

9

> [Waters] has failed to prove that the complaints with which he presented after August 28, 2008 are referable to the subject accident as opposed to one or more of the intervening events. Therefore, the symptoms reported to Dr. West cannot be assumed to have existed, either as of the date Dr. McCowin found that [Waters] reached MMI, or because of the industrial injury.

On November 11, 2008, Dr. West opined that Waters' pain was due to the subject accident. According to the Commission, Dr. West was then unaware that Waters may have sustained injuries from one or more intervening accidents. As a result, the Commission found that "Dr. West's opinions with respect to [Waters'] industrially-related limitations and restrictions lack foundation, are given no weight, and are unpersuasive for the purpose of challenging Dr. McCowin's MMI assessment."

The Commission's decision to disregard Dr. West's testimony was based on the finding that Waters "sustained a whiplash-type injury to his neck, and, possibly, a trip and fall injury to his right shoulder" before Dr. West examined him on August 28, 2008. The Commission disregarded the testimony of the vocational experts retained by claimant and Respondents because their testimony was based in part upon Dr. West's testimony. There was no basis for disregarding Dr. West's opinions and, therefore, no grounds for disregarding those of the vocational experts.

Waters was the only person who offered testimony regarding his two accidents. He disclosed the accidents in his answers to interrogatories and testified about them in his deposition and before the referee. It certainly does not appear that he was trying to hide anything. With regard to the whiplash-type incident, which occurred before Dr. West's examination, Waters testified that he had been rear-ended by another car, had gone to an urgent care place out of concern about "the plate in [his] neck," had had his motion checked, and had been told "everything looked fine in the x-ray and everything seemed to be working okay." When asked if he had some pain in his neck following that injury, he replied, "No, not really." Dr. West testified that it would have been "useful" to have information about the incident at the time he examined Waters but, as the Commission specifically found: "Dr. West opined at his deposition that a whiplash injury would affect Claimant's muscular, not his nerves, which he opined are responsible for Claimant's residual symptomology." In other words, a whiplash would not produce the type of injury that Dr. West found in his August 28 examination. This expert opinion testimony was uncontradicted.

With regard to the trip and fall incident, the referee disregarded Waters' testimony that it occurred in "Octoberish of 2008" or "October, maybe November of 2008," based solely on speculation that it occurred while Waters was working full time at the Crown Lounge. However,

Waters did not testify that it occurred after work or during the time he was working full time at the Crown Lounge. Waters testified that the Crown was one of his "hang outs" and that he "drank there frequently." He did not frequent the bar just for work. Even after he quit working at the bar full time and started working for J & R Construction in May of 2008, he continued part-time work at the Crown Lounge. There was no basis to disregard his testimony that the trip and fall occurred in October or November of 2008, after Dr. West's August 28 examination and the September 23 Cybex test. Indeed, Waters repeatedly testified that the incident occurred when the weather was a little chilly or cold. When asked what type of pain he had as a result of the fall he replied, "None other than the ones that I was suffering before." Furthermore, Dr. West was asked at his deposition if, when he saw Waters on March 31, 2009, Waters had mentioned that he had an accident "in October or November of 2008 in which he fell while leaving his work at the Crown?" Dr. West testified that he did not recall that having been mentioned. Respondents' counsel, who posited the question, apparently assumed that the trip and fall had occurred in October or November of 2008, after Dr. West had performed his examination. The question also assumed a fact not supported by the record—that he was leaving work at the Crown.

Dr. West's opinions regarding Waters' disability were based on the August 28 examination, supplemented with the Cybex test results. He stated that the whiplash type injury would not produce the type of nerve injury he diagnosed and the evidence does not support a contention that the trip and fall injury occurred before September 23. Throughout his course of treatment of Waters, Dr. West consistently opined that Waters had sustained nerve injury. In his initial examination of Waters on September 26, 2006, Dr. West "felt that [Waters] had significant findings of nerve injury" and that he "had some C6 nerve problems." Similarly, the August 28, 2008, examination disclosed a "still ongoing problem related to his weakness that he had to—C6 enervated nerves were still weak," and that Waters "had some persisting nerve pain in the C6 distribution." Dr. West concluded on November 11, based upon results of the Cybex test, that Waters "had suffered a permanent injury to the nerve." There is no indication in the record that Dr. McCowin examined or performed any testing on Waters after May 23, 2007.[3] No testimony in the record contests Dr. West's findings regarding Waters' nerve injury. Thus, there was no ground to

---

[3] Of interest is the fact that Dr. West vouched for his opinions "on a more likely than not basis," while Dr. McCowin just recorded his observations in examination notes, without explanation or attestation to any degree of medical certainty.

disregard his opinions.

> In a 1937 worker's compensation case, this Court stated:

> The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. *Manley v. Harvey Lumber Co.*, 174 Minn. 489, 221 N.W. 913, 914. In *Jeffrey v. Trouse*, 100 Mont. 538, 50 P.2d 872, 874, it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And, in *Arundel v. Turk*, 16 Cal.App.2d 293, 60 P.2d 486, 487, 488, the rule is stated thus: "Testimony which is inherently improbable may be disregarded, * * * but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions."

*Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 447−48, 74 P.2d 171, 175 (1937). *See also Dinneen v. Finch*, 100 Idaho 620, 626−27, 603 P.2d 575, 581−82 (1979); *Wood v. Hoglund*, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998); *Mazzone*, 154 Idaho at 758, 302 P.3d at 726.

Nor was there any ground to disregard Waters' testimony to the effect that neither the rear-ended accident nor the trip and fall incident aggravated his injury. He testified that he did not experience pain in his neck following the first incident and that he did not experience pain he was not already having after the second. Nothing contradicts this testimony. It should be noted that the referee found "inadequate evidence to establish that [Waters] has engaged in any activities intended to mislead this tribunal." On the issue of credibility, the referee found only that "with respect to time of onset of his relevant symptomology, [Waters'] testimony is not credible." The only problem, then, was chronology, not veracity. Therefore, his testimony regarding the lack of pain or injury from the two incidents could not be disregarded. Indeed, nobody would even have known of the two incidents, had he not volunteered information about them.

The referee's finding regarding Waters' credibility deserves some examination. The issue here appears to be substantive credibility, which is "judged on the grounds of numerous inaccuracies or conflicting facts." *Moore v. Moore*, 152 Idaho 245, 254, 269 P.3d 802, 811 (2011). In reviewing the Commission's decision, it appears that the rather narrow finding of lack of credibility is based on essentially two circumstances, the first of which was Waters' uncertainty as to the exact time of the trip and fall incident. However, as demonstrated above, the

uncertainty disappears when one eliminates the referee's speculation that this incident occurred while Waters was working full time at the Crown Lounge. The second circumstance appears to be related to Waters' failure to produce any records relating to the two post-injury incidents. As shown above, Dr. West's uncontradicted expert opinion was that the whiplash incident had no bearing on his opinion regarding Waters' injury and disability and the second incident occurred after September 23, 2008. The records would have served little purpose. Further, as shown below, neither party seems to have regarded these records as being of significance. The Commission does not explain further how Waters' "recollection of time periods relevant to onset to (sic) symptomology he attributes to the industrial injury has been, at times, inconsistent with his own prior statements or other evidence in the record."

Despite the referee's narrow finding regarding Waters' testimonial credibility, the referee then went on to question all of Waters' testimony, whether given at the hearing or by deposition, regarding his post-injury symptomology—not only the timing of symptomology but the existence thereof. The referee indicated that such testimony would be "afforded little weight [as to time of onset] in the absence of persuasive corroborating evidence." However, even when Waters' testimony was corroborated by reports to, and objective findings by, Dr. West, it was disregarded as to substance and not just timing.

Waters' purported failure to prove that the two incidents did not cause additional injury or aggravate his condition appears to be the primary ground upon which the opinions of Dr. West and, consequently, of Messrs. Granat and Jordan were given no weight. Even though no evidence was presented to show that the two incidents had any effect on Waters' medical condition, these professional opinions were essentially ignored. To a certain degree, this has the feeling of being a discovery sanction, rather than an evidentiary matter. The referee placed some emphasis on the failure to produce records pertaining to the intervening incidents. She said "scrutiny [of Waters' credibility] is heightened because the record indicates [he] did not disclose medical and employment records." Waters' recollection of the medical facility where he went after each incident (and he testified he went to the same facility for both incidents) was rather vague. He describes a facility on Utah Avenue in Idaho Falls, across the street from Wal-Mart. No records from such facility are contained in the agency record. Apparently, neither party either sought or was able to obtain them. Neither party indicated what efforts may have been made in this regard. Along with his worker's compensation complaint, Waters signed an all-encompassing medical

release authorizing Respondents to obtain any medical records they wished. Waters did disclose the two incidents in his answers to interrogatories and in both his deposition testimony and testimony at the hearing. There is no indication of any motions to compel. Apparently, neither side regarded any potential records as being pertinent to the case. This may be because no evidence contradicts his testimony that neither incident caused any additional symptoms.

One further item of concern relates to the Commission's finding with regard to the work Waters performed following Dr. McCowin's determination of medical stability. The Commission references certain work "limitations/restrictions initially imposed by Dr. West," and posits that work performed by Waters for three subsequent employers "suggests that [Waters] has the functional capabilities to perform this type of work in the future." The Commission completely ignores the fact that Waters testified he was unable to continue to do work for two of the employers that was similar to what he had done pre-injury because of neck and shoulder pain. It seems to be a bit unfair to assert that he can perform a particular type of work, when the only testimony in the record is that he was unable to do so because of continuing pain from his work-related injury.

The order of the Commission is not supported by substantial evidence and should be vacated. There was no substantial evidence to support the Commission's rather narrow finding that "with respect to time of onset of his relevant symptomology [Waters'] testimony is not credible." The Commission provided no ground for substantially expanding that finding of lack of credibility to all of Waters' testimony. There was no evidence to contradict Dr. West's expert opinion that the whiplash incident would not have affected Waters' nerve injury and, consequently, no ground to give no weight to Dr. West's opinion testimony and, consequently, to give no weight to the expert testimony of either of the parties' vocational experts. Therefore, I would vacate the order of the Commission and remand the case for further proceedings.