J. JONES, Justice,
dissenting.
I dissent from the Court’s opinion because the Commission’s order is not supported by substantial evidence. “[I]f the findings of the Commission are not supported by substantial, competent evidence, they are not *264 binding or conclusive.... In such instances, the findings of fact will set aside on appeal.” Mazzone v. Texas Roadhouse, Inc., 154 Idaho 750, 758, 302 P.3d 718, 726 (2013).
This case does not present the same situation that was before the Court in Mazzone. In that case, there was conflicting expert testimony as to whether the workers’ compensation claimant’s industrial accident included a compensable psychological condition. Id. at 755, 302 P.3d at 723. The referee in Mazzone found that the expert testifying on behalf of the employer and surety “was more credible than Mazzone’s experts because Mazzone’s experts did not review his earlier medical history.” Id. The Court concluded that the Commission’s determination was supported by the record, despite a number of errors by the referee in that case (Id. at 758-61, 302 P.3d at 726-29), the same referee who presided in this case.
This case did not involve a battle of the experts. The Respondents in this ease relied solely upon the notes of Dr. McCowin, who performed the surgery on Waters’ back on February 26, 2007. The record contains no testimony from Dr. McCowin. Apparently, neither party felt it necessary to depose him or call him as a witness at the hearing to explain his notes. On the other hand, Dr. West — the physician who first treated Waters after his injury, beginning on September 26, 2006; who referred Waters to Dr. McCowin for surgery on January 31, 2007, after conservative treatment had failed; and who treated Waters after his surgery — testified by deposition, opining that Waters’ post-surgery pain was due to the industrial injury. Dr. West’s testimony was unrebutted but, nevertheless, rejected by the referee. Contrary to the situation in Mazzone, the record here discloses that any medical history unavailable to Dr. West was immaterial to the expert testimony he presented. Some additional factual history will be helpful in this regard.
When Waters initially sought treatment for his injury from Dr. West, the doctor performed an EMG test of Waters’ upper extremity that revealed “a significant radiculopathy pattern at C6.” A subsequent MRI established that Waters suffered from degenerative disc disease at C5-6, as well as an annular tear, which Dr. West believed was related to Waters’ industrial injury. Dr. West referred Waters to Dr. McCowin for the February 2007 surgery.
After his surgery, Waters was involved in a rear-end motor vehicle accident and sustained what he described as a “whiplash” type injury to his neck.[1] Also, Waters testified that in “Octoberish of 2008” he was running home from the Golden Crown Lounge late at night when he tripped and fell, hurting his right shoulder. Waters visited an emergency care facility on both occasions, but was unable to recall the dates of those visits. The record does not contain any medical records relating to these incidents.
On August 28, 2008, more than two years after Waters’ industrial accident, he saw Dr. West, complaining of right shoulder pain. At that time, Dr. West was not aware of Waters’ rear-end motor vehicle accident or his trip and fall, if the latter had occurred by that time. Dr. West believed that the pain Waters was experiencing was due to his industrial injury and surgery because Waters’ C6 enervated nerves were still weak, which was affecting his shoulder. At this time, Dr. West ordered a Cybex test in order to better understand what was causing Waters’ pain. The Cybex test was apparently performed on September 23, 2008. On November 11, 2008, based on the results from the Cybex test, Dr. West stated, “I think it is on a more probable than not basis [that Waters’] shoulder weakness [is] related to his radiculopathy and subsequent discectomy surgery.” Further, Dr. West stated that Waters “may have an increased impairment rating. However, I have not seen his actual rating, so I cannot comment on whether or not this process was related.”
On March 31, 2009, Dr. West reevaluated Waters’ permanent partial impairment (PPI) rating, and found that instead of the 9% *265 rating assigned by Dr. McCowin, Waters had a 12% PPI. The three percentage point difference was due to the fact that Waters was reevaluated with a new edition of the AMA Guide to Impairment, which employed different markers for rating nerve injuries.
On April 20, 2009, Waters filed his workers’ compensation complaint. A hearing was held before Commission Referee LaDawn Marsters, on May 4, 2010, to address whether, and to what extent, Waters was entitled to permanent partial disability (PPD) benefits. Waters was the only witness who testified at the hearing. Included in the record were the deposition of Dr. West and the depositions and reports of two vocational rehabilitation specialists, Kent Granat and William Jordan. Granat, who was retained by Waters, concluded that as of December of 2009 Waters’ PPD was 58.4%, inclusive of impairment. In forming his opinion, Granat relied on medical reports from chiropractor Terry Burke, Dr. West, and Dr. McCowin. Jordan, hired by the Respondents, concluded that as of April of 2010 Waters’ PPD was 25-27%, inclusive of impairment. In forming his opinion, Jordan relied on medical records from Dr. West and Dr. McCowin. In addition to the vocational rehabilitation experts, Dan Wolford, Industrial Commission Rehabilitation Division Consultant, found that as of July 16, 2007, “based on the restrictions/limitations from this industrial injury, [Waters] is able to return to his customary occupation.”
The referee and Commission opined that Dr. West’s testimony as to any disability in excess of 12% PPI was entitled to no weight because he was unaware of the rear-end motor vehicle accident and trip-and-fall incident. Since the vocational experts based their opinions partly upon Dr. West’s testimony, their opinions were also disregarded. In my opinion, the Commission erred in disregarding all of the expert testimony based on supposed infirmities in Dr. West’s uncontradicted medical opinions.
Based on Dr. McCowin’s post-operative notes, the Commission found that Waters reached maximum medical improvement (MMI) on May 23, 2007.[2] The next medical record in evidence is dated August 28, 2008, when Waters returned to Dr. West complaining of shoulder pain. Between the time Dr. McCowin opined that Waters had reached MMI and when Waters again saw Dr. West, the Commission found that Waters “sustained a whiplash-type injury to his neck, and, possibly, a trip and fall injury to his right shoulder.” Due to these intervening incidents the Commission stated:
[Waters] has failed to prove that the complaints with which he presented after August 28, 2008 are referable to the subject accident as opposed to one or more of the intervening events. Therefore, the symptoms reported to Dr. West cannot be assumed to have existed, either as of the date Dr. McCowin found that [Waters] reached MMI, or because of the industrial injury.
On November 11, 2008, Dr. West opined that Waters’ pain was due to the subject accident. According to the Commission, Dr. West was then unaware that Waters may have sustained injuries from one or more intervening accidents. As a result, the Commission found that “Dr. West’s opinions with respect to [Waters’] industrially-related limitations and restrictions lack foundation, are given no weight, and are unpersuasive for the purpose of challenging Dr. MeCowin’s MMI assessment.”
The Commission’s decision to disregard Dr. West’s testimony was based on the finding that Waters “sustained a whiplash-type injury to his neck, and, possibly, a trip and fall injury to his right shoulder” before Dr. West examined him on August 28, 2008. The Commission disregarded the testimony of the vocational experts retained by claimant and *266 Respondents because their testimony was based in part upon Dr. West’s testimony. There was no basis for disregarding Dr. West’s opinions and, therefore, no grounds for disregarding those of the vocational experts.
Waters was the only person who offered testimony regarding his two accidents. He disclosed the accidents in his answers to interrogatories and testified about them in his deposition and before the referee. It certainly does not appear that he was trying to hide anything. With regard to the whiplash-type incident, which occurred before Dr. West’s examination, Waters testified that he had been rear-ended by another ear, had gone to an urgent care place out of concern about “the plate in [his] neck,” had had his motion checked, and had been told “everything looked fine in the x-ray and everything seemed to be working okay.” When asked if he had some pain in his neck following that injury, he replied, “No, not really.” Dr. West testified that it would have been “useful” to have information about the incident at the time he examined Waters but, as the Commission specifically found: “Dr. West opined at his deposition that a whiplash injury would affect Claimant’s muscular, not his nerves, which he opined are responsible for Claimant’s residual symptomology.” In other words, a whiplash would not produce the type of injury that Dr. West found in his August 28 examination. This expert opinion testimony was uncontradicted.
With regard to the trip and fall incident, the referee disregarded Waters’ testimony that it occurred in “Octoberish of 2008” or “October, maybe November of 2008,” based solely on speculation that it occurred while Waters was working full time at the Crown Lounge. However, Waters did not testify that it occurred after work or during the time he was working full time at the Crown Lounge. Waters testified that the Crown was one of his “hang outs” and that he “drank there frequently.” He did not frequent the bar just for work. Even after he quit working at the bar full time and started working for J & R Construction in May of 2008, he continued part-time work at the Crown Lounge. There was no basis to disregard his testimony that the trip and fa11 occurred in October or November of 2008, after Dr. West’s August 28 examination and the September 23 Cybex test. Indeed, Waters repeatedly testified that the incident occurred when the weather was a little chilly or cold. When asked what type of pain he had as a result of the fall he replied, “None other than the ones that I was suffering before.” Furthermore, Dr. West was asked at his deposition if, when he saw Waters on March 31, 2009, Waters had mentioned that he had an accident “in October or November of 2008 in which he fell while leaving his work at the Crown?” Dr. West testified that he did not recall that having been mentioned. Respondents’ counsel, who posited the question, apparently assumed that the trip and fall had occurred in October or November of 2008, after Dr. West had performed his examination. The question also assumed a fact not supported by the record — that he was leaving work at the Crown.
Dr. West’s opinions regarding Waters’ disability were based on the August 28 examination, supplemented with the Cybex test results. He stated that the whiplash type injury would not produce the type of nerve injury he diagnosed and the evidence does not support a contention that the trip and fall injury occurred before September 23. Throughout his course of treatment of Waters, Dr. West consistently opined that Waters had sustained nerve injury. In his initial examination of Waters on September 26, 2006, Dr. West “felt that [Waters] had significant findings of nerve injury” and that he “had some C6 nerve problems.” Similarly, the August 28, 2008, examination disclosed a “still ongoing problem related to his weakness that he had to — C6 enervated nerves were still weak,” and that Waters “had some persisting nerve pain in the C6 distribution.” Dr. West concluded on November 11, based upon results of the Cybex test, that Waters “had suffered a permanent injury to the nerve.” There is no indication in the record that Dr. MeCowin examined or performed any testing on Waters after May 23, 2007.[3] *267 No testimony in the record contests Dr. West’s findings regarding Waters’ nerve injury. Thus, there was no ground to disregard his opinions.
In a 1937 worker’s compensation case, this Court stated:
The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. Manley v. Harvey Lumber Co., 174 [175] Minn. 489, 221 N.W. 913, 914 [(1928)]. In Jeffrey v. Trouse, 100 Mont. 538, 50 P.2d 872, 874 [(1935)], it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And, in Arundel v. Turk, 16 Cal.App.2d 293, 60 P.2d 486, 487, 488 [(1936)], the rule is stated thus: “Testimony which is inherently improbable may be disregarded, * * * but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions.”
Pierstorff v. Gray’s Auto Shop, 58 Idaho 438, 447-48, 74 P.2d 171, 175 (1937). See also Dinneen v. Finch, 100 Idaho 620, 626-27, 603 P.2d 575, 581-82 (1979); Wood v. Hoglund, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998); Mazzone, 154 Idaho at 758, 302 P.3d at 726.
Nor was there any ground to disregard Waters’ testimony to the effect that neither the rear-ended accident nor the trip and fall incident aggravated his injury. He testified that he did not experience pain in his neck following the first incident and that he did not experience pain he was not already having after the second. Nothing contradicts this testimony. It should be noted that the referee found “inadequate evidence to establish that [Waters] has engaged in any activities intended to mislead this tribunal.” On the issue of credibility, the referee found only that “with respect to time of onset of his relevant symptomology, [Waters’] testimony is not credible.” The only problem, then, was chronology, not veracity. Therefore, his testimony regarding the lack of pain or injury from the two incidents could not be disregarded. Indeed, nobody would even have known of the two incidents, had he not volunteered information about them.
The referee’s finding regarding Waters’ credibility deserves some examination. The issue here appears to be substantive credibility, which is “judged on the grounds of numerous inaccuracies or conflicting facts.” Moore v. Moore, 152 Idaho 245, 254, 269 P.3d 802, 811 (2011). In reviewing the Commission’s decision, it appears that the rather narrow finding of lack of credibility is based on essentially two circumstances, the first of which was Waters’ uncertainty as to the exact time of the trip and fall incident. However, as demonstrated above, the uncertainty disappears when one eliminates the referee’s speculation that this incident occurred while Waters was working full time at the Crown Lounge. The second circumstance appears to be related to Waters’ failure to produce any records relating to the two post-injury incidents. As shown above, Dr. West’s uncontradicted expert opinion was that the whiplash incident had no bearing on his opinion regarding Waters’ injury and disability and the second incident occurred after September 23, 2008. The records would have served little purpose. Further, as shown below, neither party seems to have regarded these records as being of significance. The Commission does not explain further how Waters’ “recollection of time periods relevant to onset to (sic) symptomology he attributes to the industrial injury has been, at times, inconsistent with his own prior statements or other evidence in the record.”
Despite the referee’s narrow finding regarding Waters’ testimonial credibility, the referee then went on to question all of Waters’ testimony, whether given at the hearing *268 or by deposition, regarding his post-injury symptomology — not only the timing of symptomology but the existence thereof. The referee indicated that such testimony would be “afforded little weight [as to time of onset] in the absence of persuasive corroborating evidence.” However, even when Waters’ testimony was corroborated by reports to, and objective findings by, Dr. West, it was disregarded as to substance and not just timing.
Waters’ purported failure to prove that the two incidents did not cause additional injury or aggravate his condition appears to be the primary ground upon which the opinions of Dr. West and, consequently, of Messrs. Granat and Jordan were given no weight. Even though no evidence was presented to show that the two incidents had any effect on Waters’ medical condition, these professional opinions were essentially ignored. To a certain degree, this has the feeling of being a discovery sanction, rather than an evidentiary matter. The referee placed some emphasis on the failure to produce records pertaining to the intervening incidents. She said “scrutiny [of Waters’ credibility] is heightened because the record indicates [he] did not disclose medical and employment records.” Waters’ recollection of the medical facility where he went after each incident (and he testified he went to the same facility for both incidents) was rather vague. He describes a facility on Utah Avenue in Idaho Falls, across the street from Wal-Mart. No records from such facility are contained in the agency record. Apparently, neither party either sought or was able to obtain them. Neither party indicated what efforts may have been made in this regard. Along with his worker’s compensation complaint, Waters signed an all-encompassing medical release authorizing Respondents to obtain any medical records they wished. Waters did disclose the two incidents in his answers to interrogatories and in both his deposition testimony and testimony at the hearing. There is no indication of any motions to compel. Apparently, neither side regarded any potential records as being pertinent to the case. This may be because no evidence contradicts his testimony that neither incident caused any additional symptoms.
One further item of concern relates to the Commission’s finding with regard to the work Waters performed following Dr. McCowin’s determination of medical stability. The Commission references certain work “limitations/restrictions initially imposed by Dr. West,” and posits that work performed by Waters for three subsequent employers “suggests that [Waters] has the functional capabilities to perform this type of work in the future.” The Commission completely ignores the fact that Waters testified he was unable to continue to do work for two of the employers that was similar to what he had done pre-injury because of neck and shoulder pain. It seems to be a bit unfair to assert that he can perform a particular type of work, when the only testimony in the record is that he was unable to do so because of continuing pain from his work-related injury.
The order of the Commission is not supported by substantial evidence and should be vacated. There was no substantial evidence to support the Commission’s rather narrow finding that “with respect to time of onset of his relevant symptomology [Waters’] testimony is not credible.” The Commission provided no ground for substantially expanding that finding of lack of credibility to all of Waters’ testimony. There was no evidence to contradict Dr. West’s expert opinion that the whiplash incident would not have affected Waters’ nerve injury and, consequently, no ground to give no weight to Dr. West’s opinion testimony and, consequently, to give no weight to the expert testimony of either of the parties’ vocational experts. Therefore, I would vacate the order of the Commission and remand the ease for further proceedings.

. No testimony from a medical professional or medical record confirms that Waters’ injuiy from the July 2007 motor vehicle accident was consistent with a whiplash type injury. The only evidence about the accident comes from Waters’ own testimony.

. This finding was based on an office visit that occurred on May 23, 2007. The note Dr. McCowin made with regard to that visit reads:
07/12/07 MEDICAL REPORTS REVIEWED
Dr. McCowin — (Office Visit, 5/23/07): I think the patient has reached stability. I am going to release the patient to full activities without restrictions at this time. The only restriction, however, I would place is to avoid impact loading with axial activities, such as diving and gymnastics, etc. His permanent impairment rating will be a 9% whole person impairment.

. Of interest is the fact that Dr. West vouched for his opinions “on a more likely than not basis," *267 while Dr. McCowin just recorded his observations in examination notes, without explanation or attestation to any degree of medical certainty.